STATE OF NEBRASKA, APPELLEE, V. ALEX J. BORCHARDT, APPELLANT.

395 N.W.2d 551

Filed October 31, 1986.   No. 86-355.

48

James R. Mowbray of Mowbray, Chapin & Walker, P.C., for appellant.

Robert M. Spire, Attorney General, and Lynne R. Fritz, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

A county court jury found defendant, Alex J. Borchardt, guilty of operating or being in actual physical control of a motor vehicle while under the influence of alcoholic liquor in violation of Neb. Rev. Stat. § 39-669.07 (Reissue 1985). After an enhancement hearing, during which it was established that defendant had once before been convicted of drunk driving, the county court adjudged him guilty of second offense drunk driving and sentenced him to imprisonment for 30 days, ordered him to pay a $500 fine and costs, and suspended his driver's license for 1 year. The district court affirmed the county court's judgment and sentence. In this court defendant urges the district court erred in failing to find error appearing on the record made in the county court, in that the county court erred in (1) overruling his motion in limine, (2) overruling his motions for a mistrial, (3) admitting testimony concerning the results of the field horizontal nystagmus test, and (4) determining the evidence sufficient to support the jury's finding of guilt. We affirm.

FACTS

On June 11, 1985, at approximately 10:40 p.m., Trooper

Gerald Carlson of the Nebraska State Patrol was proceeding north on 84th Street in Lincoln when he observed a vehicle driven by defendant approaching him in the southbound lane. Carlson detected from the headlights of defendant's vehicle that it was continually crossing over the centerline. At one point defendant's vehicle crossed completely into the northbound lane, forcing Carlson into a ditch to avoid a collision. Carlson then turned his vehicle around, activated his flashing lights, and pursued defendant. Defendant continued to cross over the centerline with the left wheels of his vehicle and once again crossed completely into the northbound lane. Carlson believed that because he had been following defendant with his emergency lights flashing, an approaching vehicle had pulled over to the shoulder, thus avoiding a possible collision with defendant. Defendant eventually pulled over and came to an abrupt stop.

Carlson then pulled his patrol car behind defendant's vehicle and approached defendant. Carlson observed that defendant's eyes were bloodshot, that he emitted a moderate odor of alcohol, and that he sometimes slurred his speech. Carlson informed defendant that he had crossed the centerline several times and had nearly run his patrol car and another vehicle off the road. Defendant replied he did not feel that he had done anything wrong.

Carlson then asked defendant to accompany him to his patrol car in order that sobriety tests could be performed. While walking to the patrol car, defendant staggered and leaned on the hood of the patrol car for support. Once inside the patrol car, defendant was asked to perform several field sobriety tests. Carlson first asked defendant to recite the alphabet from *a* to *z*. Defendant slowly, but correctly, recited the alphabet to the letter *p*, when he stopped and told Carlson that he did not desire to continue. Defendant was then asked to count backward from 100 to 70 by 1s. This test was performed correctly. Defendant was next asked to count forward from 1 to 10, then backward from 10 to 1. Defendant counted from 1 to 10 correctly; however, he became confused when counting backward and mixed the numbers. Finally, Carlson asked defendant to perform a horizontal nystagmus test, the purpose of which was

to check defendant's eyes for unusual twitching or jerking, the presence of which would indicate intoxication. Carlson testified that during this test he observed a definite twitching in defendant's left eye.

Defendant was then asked to perform two further sobriety tests outside the patrol car in order to test his balance. First, defendant was asked to walk, placing one foot in front of the other, heel to toe, on a roadside line. Defendant was not able to walk heel to toe at all times and was unable to stand still without swaying. Defendant was next asked to perform a one-leg stand, raising the opposite foot off the ground 3 to 6 inches. During this test, defendant swayed "badly" and placed the suspended foot on the ground three times. Carlson testified that based on all of the facts before him, he had concluded that defendant was under the influence of alcohol.

Carlson and defendant got back into the patrol car in order for Carlson to give defendant a preliminary breath test. Defendant asked Carlson if he could be let go or allowed to park his car, to which the officer replied in the negative. Defendant then again told Carlson he felt he had not done anything wrong and wanted to speak with someone of higher authority. Carlson contacted Sgt. Kevin Stukenholtz and asked Stukenholtz to meet him at the site of the investigation.

While waiting for Stukenholtz, Carlson performed the preliminary breath test, then informed defendant that he was under arrest for driving while intoxicated. Defendant repeated he felt that he had not done anything wrong and again asked if there were any way to deal with the situation other than by arrest. Carlson replied in the negative.

When Stukenholtz arrived at approximately 11:30 p.m., he was met by Carlson and informed of what had transpired. Stukenholtz then entered the patrol car with the defendant, leaving Carlson outside. Stukenholtz testified that he observed defendant to have bloodshot eyes, a moderate odor of alcohol on his breath, and slurred speech. Defendant asked the officer the reason for his arrest and if there were not some other way the matter could be handled. Stukenholtz replied that the matter would continue according to established procedure. Defendant then asked Stukenholtz if he was "really that bad."

Defendant was then taken to the county-city jail in Lincoln. Defendant was unsteady when he walked from the patrol car to the jail. At the jail defendant was given the *Miranda* warnings and was then questioned by Carlson, with Stukenholtz observing. Stukenholtz testified that when defendant spoke, he began clearly but would ramble toward the end and start running his words together.

In reply to questioning defendant said that he had been at the Ashland Country Club for a social outing and had been drinking from approximately 7 p.m. to 10 p.m. When asked how many drinks he had consumed, he replied, "one drinking." When asked if he was intoxicated or under the influence of alcohol, defendant replied in the negative. Stukenholtz nonetheless formed the opinion that defendant was under the influence of alcohol.

Defendant testified that on the day of his arrest, he had come in from the golf course at Ashland Country Club somewhere between 5:30 and 6:15 p.m. No alcohol was allowed on the course, so defendant had not been drinking prior to this time. Up until approximately 8:30 p.m., he consumed four or five vodka tonics, after which he began to drink coffee.

Defendant admitted crossing the centerline as he was driving home that evening, but attributed the occurrence to the fact that he had been working excessively long days and was "dozing off" rather than under any influence of alcohol. He denied completely crossing the centerline or forcing any other drivers into a ditch.

Defendant also considers his performance on the field sobriety tests to have been adequate. First, defendant believes that Carlson asked him to "recite the alphabet," not "do the alphabet from A to Z." Defendant stopped at the letter *p* because he felt that he had performed adequately. Defendant also does not believe he mixed the numbers while counting backward from 10 to 1. He explains his performance on the balance tests on the grounds that it was dark and the only light provided to walk the line came from the trooper's flashlight. Defendant also testified that any difficulty he had with the one-leg stand was due to the fact that he had severely fractured his right ankle in January 1984 and had a screw placed in the

ankle for healing. Although the screw had been removed, the ankle continued to cause pain and was in fact causing pain at the time of the arrest. Defendant admitted he told Carlson he was not handicapped before performing any tests, as he does not consider himself such.

Defendant also testified that he had attempted to dissuade Carlson from arresting him because he did not believe he was under the influence of alcohol.

Carlson testified that defendant had remained friendly, cooperative, and talkative throughout the evening. The two witnesses called by defendant testified, however, that when defendant was under the influence of alcohol, he was loud, belligerent, and uncooperative. One of these witnesses, a close friend and employee of defendant, testified that he had been with defendant at the outing, and while he knew defendant had been drinking, defendant was not drunk. The other witness, also an employee of defendant, picked defendant up at the police station sometime after midnight, and he testified that he did not observe defendant to have slurred speech or to be staggering. It was this witness' opinion that defendant was not intoxicated.

## MOTION IN LIMINE

The first assignment, that the county court erred in overruling defendant's motion in limine, is based on the fact that the Intoxilyzer failed to print on the test card the reading the machine had displayed. Reasoning that such a failure would make it impossible for the State to meet its burden of proving the machine was operating properly, defendant moved for an order directing the prosecutors to refrain from making any direct or indirect reference, during opening statement or at any other stage of the trial, to the Intoxilyzer test or its results. One of the prosecutors, however, assured the court the State would lay a proper foundation for admitting the test results and detailed what she thought that evidence would be. In making its ruling the court noted that at that point it did not know what the State would be able to show in the way of foundation for admission of the test. During the State's opening statement, one of the prosecutors described the Intoxilyzer test procedure and revealed that a sample of defendant's breath produced a

reading which showed that he had .186 of 1 percent by weight of alcohol in his body fluid, more than one and a half times the ten-hundredths of 1 percent permitted by law.

The State argues that as defendant did not object to the prosecutor's statements during the opening statement, he cannot now be heard to complain about the fact that the prosecutor revealed the Intoxilyzer reading. It is true we have held that the overruling of a motion in limine does not eliminate the need to object to the introduction of evidence in order to preserve error. *State v. Harper*, 215 Neb. 686, 340 N.W.2d 391 (1983); *State v. Tomrdle*, 214 Neb. 580, 335 N.W.2d 279 (1983). It follows, therefore, that one wishing to preserve error on the basis of remarks contained in an opening statement generally must object to the questioned remarks when made, notwithstanding the overruling of a motion in limine. We have also noted, however, that a litigant may rely on a trial judge's announcement of what he or she will permit an opponent to do. *State v. Williams*, 212 Neb. 860, 326 N.W.2d 678 (1982). In the case before us the trial judge had overruled the motion in limine on the basis he did not know what foundation the State would be able to lay with respect to the Intoxilyzer test. Since the judge had acquired no further information in that regard at the time of the opening statement, it was not necessary that in order to preserve error the defendant object at that time to remarks the judge had already said he would permit the prosecutor to make.

While defendant's first assignment of error fails, it does so not because he did not object at the time the questioned remarks were made but because, as discussed in greater detail in connection with defendant's next assignment of error, the jury was admonished and instructed to disregard what it was told in that regard.

## MOTION FOR MISTRIAL

The second assignment concerns the claim that the county court erred in failing to declare a mistrial. This claim is based on two events. The first occurred when Carlson was handed a "checklist" in order that it might be marked for identification as an exhibit while he was testifying as to the manner in which the Intoxilyzer test was performed. At this time Carlson was approximately 5 feet from the jury and handling an $8^1/_2$- by

11-inch exhibit which contained, among other things, hand-printed test results in figures approximately three-sixteenths of an inch high and seven-sixteenths of an inch long. Defendant objected on the ground that Carlson held the checklist exhibit in such a fashion that the jury could see the test results. In addition to lodging his objection, the defendant moved to voir dire the jury to determine whether anyone had actually seen the results reflected on the exhibit, and also moved for a mistrial.

The second event centers around the county court's determination that the Intoxilyzer test results were inadmissible, not because the machine failed to print the test results, but because during the discovery phase the State had inadvertently supplied defendant with maintenance records for the machine which covered a period other than that which last preceded the test. The county court reasoned that having been supplied with the wrong maintenance record, defendant had been prejudiced in the preparation of his defense to the Intoxilyzer test.

In overruling defendant's various motions, the county court directed Carlson to keep the checklist exhibit out of view, and observed that although the jurors may have seen the exhibit, it was unlikely that they were able to read the test results from such a distance.

The county court also informed the jury that all testimony concerning the Intoxilyzer chemical test had been stricken from the record, and admonished that "you are specifically instructed to disregard that testimony." The county court's charge to the jury included the following instruction:

> Certain statements were made by counsel, and testimony was adduced by a witness, regarding a chemical test performed by an intoxilyzer model 4011AS. Those statements made by counsel and that testimony regarding a chemical test were stricken from the record. You are instructed to disregard those statements and that testimony and neither should influence your verdict.

It is appropriate that at this point we review some basic rules relating to motions for mistrial. The first of these is that the determination of whether to grant such a motion lies within the

sound discretion of the trial court. *State v. Bostwick,* 222 Neb. 631, 385 N.W.2d 906 (1986); *State v. Archbold,* 217 Neb. 345, 350 N.W.2d 500 (1984). A mistrial is properly granted when an event occurs during the course of a trial which is of such a nature that its damaging effects cannot be removed by proper admonition or instruction to the jury and would thus result in preventing a fair trial. Egregiously prejudicial statements of counsel, the improper admission of prejudicial evidence, and the introduction to the jury of other incompetent matters are examples of occurrences which may constitute such events. See, *State v. Bostwick, supra; State v. Archbold, supra.* Error cannot ordinarily be predicated on the failure to grant a mistrial if an objection or motion to strike the improper material is sustained and the jury is admonished to disregard such material. See, *State v. Ross,* 220 Neb. 843, 374 N.W.2d 228 (1985); *State v. Archbold, supra.* See, also, *State v. Vrchota,* 212 Neb. 567, 324 N.W.2d 394 (1982); *State v. O'Kelly,* 193 Neb. 390, 227 N.W.2d 415 (1975).

Defendant argues he was entitled to a mistrial because the revelation of the Intoxilyzer test results during the opening statement and the display of the checklist exhibit during Carlson's testimony were both done to present to the jury material the prosecutors well knew was inadmissible and that the combined damaging effect of the two events was not cured by the trial court's admonition and instruction to the jury.

It is true, as defendant argues, that a criminal defendant is entitled to a fair trial and that it is the responsibility of the prosecutor to see that the defendant receives such a trial. *State v. Atwater,* 193 Neb. 563, 228 N.W.2d 274 (1975). In recognition of that precept, the Code of Professional Responsibility adopted by this court includes as an ethical consideration to Canon 7, which provides that a lawyer should represent a client zealously within the bounds of the law, the following:

> The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict. This special duty exists because: (1) the prosecutor represents the sovereign and therefore should use restraint in the discretionary exercise of governmental

powers, such as in the selection of cases to prosecute; (2) during trial the prosecutor is not only an advocate but he also may make decisions normally made by an individual client, and those affecting the public interest should be fair to all; and (3) in our system of criminal justice the accused is to be given the benefit of all reasonable doubts. With respect to evidence and witnesses, the prosecutor has responsibilities different from those of a lawyer in private practice; the prosecutor should make time [sic] disclosure to the defense of available evidence known to him that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment. Further, a prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage the prosecutor's case or aid the accused.

Canon 7, EC 7-13, Code of Professional Responsibility (rev. 1984). Additionally, the following disciplinary rule has been adopted: "In appearing in his professional capacity before a tribunal, a lawyer shall not: (1) State or allude to any matter that he has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence." Canon 7, DR 7-106(C)(1), Code of Professional Responsibility (rev. 1984).

Consequently, if the record were to have established that the prosecutors deliberately put before the jury the Intoxilyzer test results, knowing full well that that evidence was inadmissible, they would have been subject to discipline, no matter what the outcome of this case. The record does not, however, so establish. What the record does establish is that the prosecutors were in the process of laying the foundation one of them had represented would be adduced as a foundation for admitting the Intoxilyzer test into evidence. Without countervailing testimony, the fact that the Intoxilyzer failed to print the test results does not necessarily mean the machine did not properly measure the level of alcohol in defendant's blood. The record also shows the prosecutors were handling more than one case with defendant's counsel which involved Intoxilyzer test results. Thus, there existed a reasonable explanation for inadvertently giving defendant the wrong maintenance record.

We therefore conclude there was nothing so flagitious about the conduct of the prosecutors as to require the declaration of a mistrial. We also conclude there was nothing so indelibly damaging about the stricken remarks and evidence that the county court's admonition and instruction to the jury did not adequately protect defendant.

## HORIZONTAL NYSTAGMUS TEST

There being no merit to defendant's second assignment of error, we move on to a consideration of his third assignment, that the county court erred in admitting Carlson's testimony about the field horizontal nystagmus test.

Carlson testified that he received training in administering the test at a seminar given at the State Patrol office in Lincoln. The seminar was taught by another patrol officer who had received his training elsewhere. During the seminar, Carlson performed the test on both intoxicated and sober volunteers and was able to compare the results from each group. The seminar concluded with a written examination, after which Carlson was given some sort of certificate.

The admission of expert testimony is ordinarily within the discretion of the trial court, and its ruling will be upheld in the absence of an abuse of discretion. *State v. Jones*, 213 Neb. 1, 328 N.W.2d 166 (1982). Neb. Rev. Stat. § 27-702 (Reissue 1985) provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

The major difficulty with the testimony is that the record contains no competent evidence that this new test is valid, that is, that it in fact reveals the presence of intoxication. Evidence of a test result cannot be characterized as "scientific" or qualify as "technical or other specialized knowledge," and thus within the purview of § 27-702, unless and until it is established that the the test result demonstrates what it is claimed to demonstrate. It was such a failure of proof which led this court to conclude in *Boeche v. State*, 151 Neb. 368, 37 N.W.2d 593 (1949), that polygraph, or so-called "lie detector test," results had not gained such standing and scientific recognition as to

justify being admitted into evidence.

Thus, the county court erred in permitting Carlson to testify as to the administration and interpretation of the horizontal nystagmus test.

That conclusion does not, however, resolve the matter, for a conviction will not be set aside in the absence of a showing that an error created prejudice. *State v. Lynch,* 223 Neb. 849, 394 N.W.2d 651 (1986). No prejudice resulted from the error, because Carlson's opinion was based on a number of other factors, and, more importantly, the other evidence, as the discussion which follows demonstrates, overwhelmingly establishes that defendant was under the influence of alcohol to the extent that his driving abilities were substantially impaired. It should perhaps be noted, however, that counsel acts at his or her peril when undertaking to overprove a point. In a marginal case the receipt of improper evidence may well lead to a reversal of the trial result.

## SUFFICIENCY OF EVIDENCE

Defendant's fourth and final assignment of error challenges the sufficiency of the evidence to support the jury's finding of guilt. In support of this assignment defendant reminds us of the testimony which contradicts that of Carlson and Stukenholtz. It, however, is a well-established axiom that in resolving a challenge to the sufficiency of the evidence, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such is for the trier of fact and must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Hruza,* 223 Neb. 837, 394 N.W.2d 643 (1986); *State v. Ellis,* 223 Neb. 779, 393 N.W.2d 719 (1986). Stated more simply, it is not for this court to accept one version of a case over another; that is for the jury. *State v. Murphrey,* 220 Neb. 699, 371 N.W.2d 702 (1985). Moreover, it is well established that after a jury has considered all of the evidence and returned a verdict of guilty, that verdict may not, as a matter of law, be set aside on appeal for insufficiency of the evidence if the evidence sustains some rational theory of guilt. *State v. Wilkening,* 222 Neb. 107, 382 N.W.2d 340 (1986).

There is more than sufficient evidence to sustain a rational theory of guilt. Carlson testified that upon the initial confrontation with defendant, he observed that defendant's eyes were bloodshot, that he smelled of alcohol, and that his speech was slurred. Further, defendant performed inadequately on several field sobriety tests. In addition, there was the matter of defendant's own admission as to the amount of alcohol he had consumed, and Stukenholtz's corroboration of many of the observations made by Carlson. Most importantly, there was defendant's erratic and dangerous driving itself.

## DECISION

The judgment of the district court, being correct, is affirmed.

AFFIRMED.