**CITY OF FARGO, Plaintiff and Appellee,**

v.

**Jon Bret McLAUGHLIN, Defendant and Appellant.**

**Cr. No. 930130.**

Supreme Court of North Dakota.

Feb. 23, 1994.

---

Erik R. Johnson (argued), Asst. City Atty., Fargo, for plaintiff and appellee.

C. Charles Chinquist (argued), Fargo, for defendant and appellant. Appearance by appellant Jon B. McLaughlin.

MESCHKE, Justice.

We consider whether a police officer may testify about the results of a horizontal gaze nystagmus ["HGN"] test without the State first establishing the scientific reliability of the test by expert testimony. We mainly hold that the trial court did not abuse its discretion in admitting evidence of the HGN test results in this case. We also hold that Jon Bret McLaughlin timely appealed after a motion for new trial, and that the prosecution's evidentiary use of McLaughlin's independent urine test was not obvious error. We affirm McLaughlin's conviction for driving under the influence of alcohol.

Officer Ternes of the Fargo Police Department was investigating a traffic accident when he heard a loud crash. He saw that McLaughlin's vehicle had struck a traffic sign about one block away. When McLaughlin began driving away, Ternes followed in his patrol car and stopped him.

McLaughlin appeared disoriented and sleepy, and smelled strongly of alcohol. McLaughlin failed several field sobriety tests, including the "one-leg stand" test, the "walk and turn" test, and the HGN test. Ternes did not conduct a preliminary breath screening test because McLaughlin had blood and chewing tobacco in his mouth.

Ternes arrested McLaughlin for driving under the influence of alcohol (DUI), and took him to a hospital for treatment of his injuries and to have blood drawn for a blood-alcohol test. McLaughlin refused to consent to a blood test, but at some later point independently obtained a urine test to determine his blood-alcohol level.

McLaughlin was charged with DUI and failure to comply with duty upon striking fixtures. At a jury trial, Ternes was allowed to testify, over objection, about McLaughlin's failure of the HGN test. Ternes also testified that, based upon his observations and McLaughlin's performance on the field sobriety tests, it was Ternes's opinion that McLaughlin was under the influence of alcohol at that time. The State also elicited testimony from Ternes and McLaughlin about the urine test performed at McLaughlin's request. In closing arguments, the State commented upon McLaughlin's failure to present evidence about the result of that independent test.

On January 29, 1993, the jury returned guilty verdicts on both counts, and a judgment of conviction was entered. On February 5, 1993, McLaughlin, acting individually, filed a request to extend the time for filing a motion for new trial. McLaughlin's trial

counsel, apparently unaware of McLaughlin's pro se motion, filed a notice of appeal on February 8, 1993. On March 5, 1993, while the appeal was pending, new counsel for McLaughlin filed a motion for new trial. A stipulation to dismiss the appeal was filed so the motion for new trial could be heard in the trial court. The first appeal was dismissed on March 10, 1993. The trial court later denied the motion for new trial, and McLaughlin appealed.

## I. APPELLATE JURISDICTION

The procedure employed below raises jurisdictional questions. NDRCrimP 37(b)(1) and NDRAppP 4(b)(1) say that, if a "timely" motion for new trial is made, an appeal from the judgment of conviction may be taken within ten days after entry of an order denying the motion. The notice of appeal in this case was filed within ten days after entry of the order; the question is whether the March 5, 1993 motion for new trial was "timely."

■ A motion for new trial on grounds other than newly discovered evidence "shall be made within seven days after verdict or finding of guilt or within such further time as the court may fix during the seven-day period." NDRCrimP 33(c). The time limitations of Rule 33 are jurisdictional, and the court is without power to consider an untimely motion for new trial or to extend the time for such a motion except as specifically provided in the Rule. *State v. Simek,* 502 N.W.2d 545, 546 (N.D.1993); *State v. Copeland,* 448 N.W.2d 611, 614 (N.D.1989); *see also* 3 C. Wright, Federal Practice and Procedure: Criminal 2d § 558 (1982); 8A Moore's Federal Practice ¶ 33.02[2][a] (1993). In this case, McLaughlin filed a motion for extension of time on Friday, February 5, 1993, the seventh day after the verdict.

Before the trial court ruled on the motion for extension, however, McLaughlin's trial counsel filed a notice of appeal on Monday, February 8, 1993, the tenth day after the verdict. The filing of the notice of appeal deprived the trial court of jurisdiction. *See*

*State v. Meier,* 422 N.W.2d 381, 386 (N.D. 1988).[1] When the trial court regained jurisdiction upon dismissal of the appeal, the court implicitly granted the motion for extension of time by considering and deciding the motion for new trial upon the merits.

To resolve this question, we must construe the language of Rule 33 that says a motion for new trial is permitted "within such further time as the court may fix during the seven-day period." The crucial question is whether the court must actually enter its order extending the time for the motion within the seven-day period, or if it suffices that the motion for extension was filed within seven days.

The time limits in Rule 33 are identical to those in the corresponding federal rule, and federal precedent construing that rule is instructive to assist our interpretation of Rule 33. *State v. Copeland,* 448 N.W.2d at 614. The only federal case to address this question in an analogous setting holds that a court may rule on the motion to extend after the seven days have passed if the motion for extension was made within the seven-day period. *United States v. Hosch,* 712 F.Supp. 524 (E.D.La.1989), *aff'd,* 915 F.2d 1567 (5th Cir.1990). In *Hosch,* the motion for extension was filed on the seventh day after the verdict, but the clerk did not forward it to the judge until the eighth day. The court held that it had jurisdiction to grant the motion:

> The issue, then, is whether the Court has the jurisdictional power to grant the motion now that more than seven "days" after the verdict have passed. The Court has found no cases directly on point. Nonetheless, the Court believes it has jurisdiction to grant an extension, where as here the motion itself was filed timely.

*United States v. Hosch,* 712 F.Supp. at 524. We agree with that result.

A criminal defendant faces stringent time limits for post-trial motions and appeals. *See* NDRCrimP 33(c), 34, and 37(b)(1); NDRAppP 4(b). Compare *State v. Hanson,*

---

1. *State v. Prince,* 66 N.W.2d 796, 799–800 (N.D. 1954), holding that a trial court may entertain a motion for new trial while an appeal is pending, was decided before adoption of the Rules of Criminal Procedure and is inapposite.

452 N.W.2d 329, 330 (N.D.1990) (trial court cannot reduce sentence under NDRCrimP 35(b) more than 120 days after sentence even if defendant timely moved). It would be unrealistic and unfair to require the defendant to move for extension and to secure the order from the court within seven days because situations will certainly arise where the judge is unavailable to issue an immediate order on a timely filed motion. It is not the intent of the rule to penalize a defendant in such situations. Under NDRCrimP 2, the Rules of Criminal Procedure are to be construed to secure fairness in administration.

■ We construe NDRCrimP 33(c) to allow a court to grant an extension after the seven-day period has expired if the motion for extension was made within the seven-day period. Accordingly, the motion for new trial in this case was timely, and the filing of the notice of appeal within ten days after disposition of the motion properly conferred jurisdiction on this court.

## II. EVIDENTIARY USE OF INDEPENDENT TEST

■ McLaughlin asserts that the trial court erred in admitting testimony about the independent urine test performed at the hospital at McLaughlin's request, and in allowing the prosecutor to comment upon McLaughlin's failure to introduce the results of that test. McLaughlin's trial counsel did not object to the testimony or to the prosecutor's closing comments. A question not preserved by objection in the trial court will not be considered for the first time on appeal. *State v. Steffes,* 500 N.W.2d 608, 615 (N.D. 1993). Nor did McLaughlin raise this question in his motion for a new trial. When a party moves for a new trial, any subsequent appeal by that party is limited to review of grounds presented in the motion to the trial court. *State v. Jordheim,* 508 N.W.2d 878, 880–881 (N.D.1993). This question was not brought to the attention of the trial court, nor preserved for review.

■ McLaughlin asserts, however, that this alleged error is obvious error under NDRCrimP 52(b):

Obvious errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

Our power to notice obvious error is exercised cautiously and only in exceptional situations where the defendant has suffered serious injustice. *State v. Purdy,* 491 N.W.2d 402, 409 (N.D.1992); *State v. McNair,* 491 N.W.2d 397, 399 (N.D.1992). In assessing the possibility of error affecting substantial rights under Rule 52(b), we examine the entire record and the probable effect of the alleged error in light of all the evidence. *State v. Johnson,* 379 N.W.2d 291, 293 (N.D. 1986). The admission of the challenged testimony and the prosecutor's comments, considered within the context of the entire record, do not constitute obvious error.

## III. EVIDENCE OF GAZE NYSTAGMUS

■ The principal question on appeal is the admissibility of Ternes's testimony about McLaughlin's performance on the HGN test. The HGN test is one of several field sobriety tests recommended by the National Highway Traffic Safety Administration to aid officers in determining whether a driver is intoxicated. *State v. Witte,* 251 Kan. 313, 836 P.2d 1110, 1112 (1992), explains:

Nystagmus is "an involuntary rapid movement of the eyeball, which may be horizontal, vertical, rotatory, or mixed." Dorland's Illustrated Medical Dictionary 1068 (25th ed. 1974); see 3 Schmidt's Attorneys' Dictionary of Medicine N–102 (1991); Stedman's Medical Dictionary 1074 (25th ed. 1990). HGN is

"a jerking of the eyes as they gaze to the side. Many people will exhibit some nystagmus, or jerking, as their eyes track to the extreme side. However, as people become intoxicated, the onset of the nystagmus, or jerking, occurs after fewer degrees of lateral deviation, and the jerking at the more extreme angles becomes more distinct." 1983 NHTSA Study at 2.

"The theory behind the gaze nystagmus test is that there is a strong correlation between the amount of alcohol a person consumes and the angle of onset of the

nystagmus." Carper & McCamey, 77 Ill. B.J. at 147; see Whitmore, Roadside Sobriety Tests: A Police Officers' Guide to Making Drunk Driving Arrests Stand Up in Court § 5:05 (1987).

This is how the test is performed:

In the HGN test the driver is asked to cover one eye and focus the other on an object (usually a pen) held by the officer at the driver's eye level. As the officer moves the object gradually out of the driver's field of vision toward his ear, he watches the driver's eyeball to detect involuntary jerking. The test is repeated with the other eye. By observing (1) the inability of each eye to track movement smoothly, (2) pronounced nystagmus at maximum deviation and (3) onset of the nystagmus at an angle less than 45 degrees in relation to the center point, the officer can estimate whether the driver's blood alcohol content (BAC) exceeds the legal limit of .10 percent.

State v. Superior Court, 149 Ariz. 269, 718 P.2d 171, 173 (1986). The Supreme Court of Kansas further explains:

There are three possible signs of intoxication for each eye:

"Angle of Onset—the more intoxicated a person becomes, the sooner the jerking will occur as the eyes move to the side.

"Maximum Deviation—the greater the alcohol impairment the more distinct the nystagmus is when the eyes are as far to the side as possible.

"Smooth Pursuit—an intoxicated person often cannot follow a slowly moving object smoothly with his eyes." 2 Nichols, Drinking/Driving Litigation § 26:01, p. 159 (1992 Supp.).

A score of six points is possible, three for each eye. According to the NHTSA, if a driver scores four or more points, the driver's BAC is above .10.

State v. Witte, 836 P.2d at 1113. These decisions describe the underlying physiological basis for the HGN test.

The Arizona Supreme Court's decision in State v. Superior Court is the seminal case on admissibility of HGN test results. In that case, the lower court had received volumi-

nous testimony on the scientific basis and reliability of the test. The Arizona Supreme Court also consulted numerous treatises, articles, and empirical studies discussing the scientific basis for the test, and compiled a lengthy bibliography of those sources. See State v. Superior Court, 718 P.2d at 182–184. Based upon the expert testimony and written authorities, the court concluded that the HGN test had gained general acceptance in the scientific community, and that it therefore satisfied the requirements of Frye v. United States, 293 F. 1013 (D.C.Cir.1923):

The evidence demonstrates that the following propositions have gained general acceptance in the relevant scientific community: (1) HGN occurs in conjunction with alcohol consumption; (2) its onset and distinctness are correlated to BAC; (3) BAC in excess of .10 percent can be estimated with reasonable accuracy from the combination of the eyes' tracking ability, the angle of onset of nystagmus and the degree of nystagmus at maximum deviation; and (4) officers can be trained to observe these phenomena sufficiently to estimate accurately whether BAC is above or below .10 percent.

State v. Superior Court, 718 P.2d at 181. The court carefully pointed out, however, that HGN test results were not admissible to quantify a specific level of blood-alcohol content. State v. Superior Court, 718 P.2d at 181–182. Later, in State ex rel. Hamilton v. City Court, 165 Ariz. 514, 799 P.2d 855, 858 (1990), the court reiterated that the HGN test results may not be used to quantify a specific blood-alcohol level, but only to show "a symptom or clue of impairment." The court concluded:

Evidence derived from the HGN test, in the absence of a chemical analysis, although relevant to show whether a person is under the influence of alcohol, is only relevant in the same manner as are other field sobriety tests and opinions on intoxication. In such a case, HGN test results may be admitted only for the purpose of permitting the officer to testify that, based on his training and experience, the results indicated possible neurological dysfunction, one cause of which could be alcohol in-

gestion. The proper foundation for such testimony, which the State may lay in the presence of the jury, includes a description of the officer's training, education, and experience in administering the test and a showing that the test was administered properly. The foundation may not include any discussion regarding the accuracy with which HGN test results correlate to, or predict, a BAC of greater or less than .10%.

*State ex rel. Hamilton v. City Court,* 799 P.2d at 859–860. Like other physical sobriety tests, HGN test results can be relevant.

Since the decision in *State v. Superior Court,* numerous courts have faced the question whether evidence of HGN test results is admissible without establishing scientific reliability of the test by expert opinion. The decisions have produced a wide spectrum of views elsewhere, but this court is called on here to consider the question for the first time. Simply stated, the question is whether the State must meet the *Frye* standard through expert testimony as a prerequisite to admissibility of the test results.[2]

A number of decisions have relied upon *State v. Superior Court,* and subsequent decisions, to hold that the scientific reliability of the HGN test has been established without the need for expert testimony in a particular case. *State v. Garrett,* 119 Idaho 878, 811 P.2d 488, 491 (1991); *People v. Buening,* 229 Ill.App.3d 538, 170 Ill.Dec. 542, 547–48, 592 N.E.2d 1222, 1227–1228 (1992); *State v. Armstrong,* 561 So.2d 883, 887 (La.Ct.App. 1990); *State v. Bresson,* 51 Ohio St.3d 123, 554 N.E.2d 1330, 1334 (1990); *Anderson v. State,* 866 S.W.2d 685, 686 (Tex.Ct.App.1993); *Howard v. State,* 744 S.W.2d 640, 641 (Tex. Ct.App.1987). In effect, based upon the conclusions of other courts in other cases, these courts have held the HGN test scientifically reliable as a matter of law.

Another band of decisions holds that the HGN test is no more scientific than other field sobriety tests, and does not require expert testimony as a foundation for admissibility. *Whitson v. State,* 314 Ark. 458, 863 S.W.2d 794, 798 (1993); *People v. Ojeda,* 225 Cal.App.3d 404, 275 Cal.Rptr. 472, 474 (1990); *State v. Edman,* 452 N.W.2d 169, 170 (Iowa 1990); *State v. Murphy,* 451 N.W.2d 154, 157 (Iowa 1990); *State v. Garris,* 603 So.2d 277, 282 (La.Ct.App.1992); *State v. Nagel,* 30 Ohio App.3d 80, 506 N.E.2d 285, 286 (1986); *State v. Sullivan,* —— S.C. ——, 426 S.E.2d 766, 769 (1993). The rationale for this view was explained in *State v. Nagel,* 506 N.E.2d at 286:

[The HGN test] is not comparable, as Nagel contends, to a polygraph test which requires the use of a machine, the scientific reliability of which may be questioned. The gaze nystagmus test, as do the other commonly used field sobriety tests, requires only the personal observation of the officer administering it. It is objective in

2. NDREv 702 says:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

 The United States Supreme Court has recently held that the *Frye* test, requiring general acceptance within the relevant scientific community, has been superseded by FREv 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, ——–——, 113 S.Ct. 2786, 2793–2794, 125 L.Ed.2d 469, 479–480 (1993). The Montana Supreme Court has held that its version of Rule 702, rather than the *Frye* general acceptance test, governs admissibility of HGN test results. *State v. Clark,* 234 Mont. 222, 762 P.2d 853, 856 (1988). In holding the test results admissible, the court noted that, "[u]nless an exaggerated popular opinion of the accuracy of the particular technique makes its use prejudicial or likely to mislead the jury, the better approach is to admit all relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination or refutation." *State v. Clark,* 762 P.2d at 856. Similarly, in *State v. O'Key,* 123 Or.App. 54, 858 P.2d 904, 907 (1993), the Court of Appeals of Oregon held HGN test results admissible under its version of Rule 702, concluding that "there is no question that evidence of the results of defendant's HGN test make the existence of the fact that he was under the influence of alcoholic beverages more likely and would assist the trier of fact in making that determination." *See also State v. Gleason,* 123 Idaho 62, 844 P.2d 691, 694 (1992); *State v. Murphy,* 451 N.W.2d 154, 156, 158 (Iowa 1990); Busloff, Comment, *Can Your Eyes Be Used Against You? The Use of the Horizontal Gaze Nystagmus Test in the Courtroom,* 84 J.Crim.L. & Criminology 203 (1993).

nature and does not require expert interpretation. Objective manifestations of insobriety, personally observed by the officer, are always relevant where, as here, the defendant's physical condition is in issue.

In effect, these cases equate HGN test results to a physical manifestation, like the staggering gait of a drunk.

Another band in this spectrum of opinions holds that expert testimony is required to demonstrate general acceptance in the relevant scientific community before HGN test results may be admitted. *Malone v. City of Silverhill,* 575 So.2d 101, 103–104 (Ala.Crim. App.1989), *rev'd on other grounds,* 575 So.2d 106 (Ala.1990); *People v. Leahy,* 17 Cal.App. 4th 1796, 22 Cal.Rptr.2d 322, 328 (1993); *People v. Vega,* 145 Ill.App.3d 996, 99 Ill.Dec. 808, 811–12, 496 N.E.2d 501, 504–505 (1986); *State v. Witte,* 836 P.2d at 1116; *State v. Wheeler,* 764 S.W.2d 523, 524–525 (Mo.Ct. App.1989); *State v. Borchardt,* 224 Neb. 47, 395 N.W.2d 551, 559 (1986); *People v. Torrey,* 144 A.D.2d 865, 534 N.Y.S.2d 807, 809 (1988); *State v. Reed,* 83 Or.App. 451, 732 P.2d 66, 68–69 (1987); *Commonwealth v. Moore,* 430 Pa.Super. 575, 635 A.2d 625, 629 (1993); *Commonwealth v. Miller,* 367 Pa.Super. 359, 532 A.2d 1186, 1189 (1987); *State v. Cissne,* 72 Wash.App. 677, 865 P.2d 564, 566 (1994); *State v. Barker,* 179 W.Va. 194, 366 S.E.2d 642, 644–646 (1988). The Supreme Court of Kansas summarized the underlying rationale of this view[3]:

> These courts have given various reasons for holding that HGN evidence is scientific in nature: The HGN test is distinguished from other field sobriety tests in that science, rather than common knowledge, provides the legitimacy for HGN testing.... Certain reactions to alcohol are so common that judicial notice will be taken of them; however, HGN testing does not fall into this category.... HGN test results are "scientific evidence based on the scientific principle that consumption of alcohol

causes the type of nystagmus measured by the HGN test." ... HGN evidence could have a disproportionate impact on the jury's decisionmaking process because of the test's scientific nature and because the jury may not understand the nature of the test or the methodology of its procedure.

*State v. Witte,* 836 P.2d at 1115 (citations omitted). In effect, these cases require HGN test results to be scientifically validated in each individual case, or at least recognized as scientifically valid once by an appellate court within the jurisdiction.

We begin our analysis by noting that the underlying scientific basis for HGN testing—that intoxicated persons exhibit nystagmus—is undisputed, even by those cases and authorities holding the test inadmissible without scientific proof in each case. *State v. Superior Court,* 718 P.2d at 177, 181; *State v. Witte,* 836 P.2d at 1112; *State v. Garrett,* 811 P.2d at 491; *State v. Cissne,* 865 P.2d at 566; Rouleau, *Unreliability of the Horizontal Gaze Nystagmus Test,* 4 Am.Jur. P.O.F.3d 439, 446 (1989). It is generally accepted that a person will show a greater degree of nystagmus at higher levels of intoxication, and that a properly conducted HGN test can identify nystagmus. *See State v. Superior Court,* 718 P.2d at 181; *State v. Witte,* 836 P.2d at 1112–1113. We take notice of these physiological facts, and conclude that it is unnecessary to require expert testimony of these widely accepted principles.

These principles comprise the only "scientific" components of the HGN test. The officer, based upon his training in these principles, observes the objective physical manifestations of intoxication, and no expert interpretation is required. *State v. Murphy,* 451 N.W.2d at 157; *State v. Nagel,* 506 N.E.2d at 286. The test requires simply that the officer observe the subject's eyes following a moving object.

Those cases and other authorities, that urge an individualized scientific foundation

---

**3.** Many of these cases, holding that it was error to admit HGN test results without expert testimony about the scientific reliability of the test, went on to hold the error harmless, allowing affirmance of the convictions. For examples, *see People v. Leahy,* 22 Cal.Rptr.2d at 329; *People v.*

*Vega,* 496 N.E.2d at 505; *State v. Wheeler,* 764 S.W.2d at 525; *State v. Borchardt,* 224 Neb. 47, 395 N.W.2d at 559; *People v. Torrey,* 534 N.Y.S.2d at 809; *State v. Reed,* 732 P.2d at 69; *Commonwealth v. Miller,* 532 A.2d at 1190.

by expert testimony for admission of HGN test results in each case, point to a number of factors allegedly showing the unreliability of the test: the potential for false positive results; other possible physiological causes for nystagmus; lack of close correlation between degree of nystagmus and a specific blood-alcohol content [4]; bias of the testing officer; and difficulty of proper administration of the test in the field. *State v. Witte,* 836 P.2d at 1119–1120; Erwin, Defense of Drunk Driving Cases §§ 8A.08[4] and [5] (3d ed. 1993); 2 Tarantino, Defending Drinking Drivers § 560 (1993); Rouleau, *Unreliability of the Horizontal Gaze Nystagmus Test,* 4 Am.Jur. P.O.F.3d at 452–456. None of these factors undercuts the scientific foundation of the test: intoxicated persons exhibit nystagmus, and a properly administered HGN test will identify that nystagmus. All of the troubling factors would apply equally to the other field sobriety tests, such as the "one-leg stand" test and the "walk and turn" test administered in this case, that are routinely admitted into evidence in DUI prosecutions. As *State v. O'Key,* 858 P.2d at 907, suggests, all of these factors can be shown through cross-examination or expert testimony, and therefore they go to the *weight* of the evidence, rather than its admissibility.

Some of the cases, holding that a scientific foundation by expert testimony is required in each case for admission of HGN test results, rely heavily upon the fact that the effects of alcohol upon nystagmus are not within the common knowledge of jurors. *People v. Leahy,* 22 Cal.Rptr.2d at 328; *State v. Witte,* 836 P.2d at 1115. In other contexts, however, we have noted that "[t]rained law enforcement officers may observe and be able to perceive and articulate meaning to presumably innocent conduct which may pass without notice by an untrained observer." *State v. Gilberts,* 497 N.W.2d 93, 98 (N.D.1993); *State v. Everson,* 474 N.W.2d 695, 702 n. 2 (N.D.1991). Similarly, in the "reasonable suspicion" context, we have emphasized that trained officers may make inferences and deductions that may elude laypersons. *State*

*v. Sarhegyi,* 492 N.W.2d 284, 287 (N.D.1992); *State v. Woytassek,* 491 N.W.2d 709, 710 (N.D.1992); *State v. Bryl,* 477 N.W.2d 814, 816 (N.D.1991). This deference to the "trained observer" is equally appropriate here, where a trained officer is called upon to offer an opinion on the accused's condition.

Through specialized training in HGN, the officer is able to draw inferences and deductions from his observations of the accused that might elude laypersons. The HGN test shows "a symptom or clue of impairment" to the trained officer, *State ex rel. Hamilton v. City Court,* 799 P.2d at 858, and assists the officer in assessing the defendant's condition. *State v. Garris,* 603 So.2d at 282; *State v. Nagel,* 506 N.E.2d at 286. As explained by the Idaho Supreme Court in *State v. Gleason,* 844 P.2d at 695:

> [The officer's] testimony relating to the HGN test results was not offered as independent scientifically sound evidence of Gleason's intoxication. Rather, it was offered and admitted for the same purpose as other field sobriety test evidence—a physical act on the part of Gleason observed by the officer contributing to the cumulative portrait of Gleason intimating intoxication in the officer's opinion.

In sum, we agree with those cases that stress that HGN test results are admissible in conjunction with other field sobriety tests. For examples, *see Whitson v. State,* 863 S.W.2d at 798; *State v. Gleason,* 844 P.2d at 695; *State v. Nagel,* 506 N.E.2d at 286; *State v. Sullivan,* 426 S.E.2d at 769. Where the officer has conducted other field sobriety tests in addition to the HGN test, the results of the HGN test are but one of the physical observations to support the officer's opinion that the accused was intoxicated.

■ Under the circumstances of this case, where the HGN test was given in conjunction with other field sobriety tests that formed the basis for the officer's opinion testimony on the defendant's intoxication, we conclude that it was not reversible error to admit the

---

4. This factor does not seem especially relevant where, as here, the officer did not attempt to quantify a specific BAC from the results of the HGN test. The cases uniformly limit HGN evidence to show only an unspecified level of intoxication; the witness is not allowed to testify that the test demonstrated a specific BAC.

officer's testimony about HGN test results without scientific foundation by expert testimony. We agree with those cases holding that the only foundation required is a showing of the officer's training and experience in administering the test, and a showing that the test was in fact properly administered.[5] *See State ex rel. Hamilton v. City Court,* 799 P.2d at 858; *State v. Superior Court,* 718 P.2d at 181; *People v. Buening,* 592 N.E.2d at 1227; *State v. Armstrong,* 561 So.2d at 887; *State v. Bresson,* 554 N.E.2d at 1334. With that foundation, the HGN test results are admissible only as circumstantial evidence of intoxication, and the officer may not attempt to *quantify* a specific BAC based upon the HGN test. *See State v. Superior Court,* 718 P.2d at 181–182; *Whitson v. State,* 863 S.W.2d at 798; *People v. Buening,* 592 N.E.2d at 1227; *State v. Bresson,* 554 N.E.2d at 1336. The trial court did not abuse its discretion in admitting evidence of the HGN test results in this case.

The judgment of conviction is affirmed.

VANDE WALLE, C.J., and LEVINE, NEUMANN and SANDSTROM, JJ., concur.

---

**5.** McLaughlin has not asserted on appeal that the officer was not properly trained or that the test was improperly administered. We note, however, that the record in this case is sparse on the officer's training and on the actual administration of the test. The State will ordinarily be expected to develop an adequate record on these foundational factors when it seeks to introduce the HGN test results through the police officer.